UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
KYNDRA FRAZIER,

                           Plaintiff,           Case No.: 22-cv-05270

      - against -

FCBC COMMUNITY DEVELOPMENT
CORPORATION and MICHAEL WALROND,

                           Defendants.
----------------------------------------------------------------------X

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### ORAL ARGUMENT REQUESTED

MILBER MAKRIS PLOUSADIS & SEIDEN, LLP
*Attorneys for Defendants*
*FCBC Community Development Corporation*
*and Michael Walrond*
1000 Woodbury Road, Suite 402
Woodbury, New York 11797
(516) 712-4000

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………ii

PRELIMINARY STATEMENT………………………………………………...1

STATEMENT OF FACTS……………………………………………………...2

SUMMARY JUDGEMENT STANDARD……………………………………...6

LEGAL ARGUMENT…………………………………………………………...7

    I.      PLAINTIFF WAS AN EXEMPT EXECUTIVE UNDER THE NYLL….7

          A. Elements of the Executive Exemption……………………………...…..8

          B. Salary Basis Test……………………...………………………………9

          C. Duties Test……………………………………………………………9

               1.  Plaintiff's primary duty was management of the HOPE Center….10

               2.  Plaintiff customarily and regularly directed the work of two or

                   more other employees……………………………………………10

               3.  Plaintiff had the authority to hire or fire other employees and/or her

                   suggestions for same carried particular weight……………………12

    II.     PLAINTIFF WAS AN EXEMPT LEARNED PROFESSIONAL

         UNDER THE NYLL……………………………………………...........13

          A. Salary Basis Test……………………………………………………14
          B. Primary Duty Test……………………………………………...…14

    III.    NO ARTICLE III STANDING EXISTS FOR PLAINTIFF'S WAGE

         STATEMENT AND WAGE NOTICE CLAIMS………………………17

     CONCLUSION………………………………………………………19

# TABLE OF AUTHORITIES

Page(s)

Cases

*Boutsikakis v. Tri-Borough Home Care, Ltd.,*
No. 15 CV 5833 (DG)(RML), 2023 WL 3620646 (E.D.N.Y. Apr. 11, 2023) ........................... 15

*D'Arpa v. Runway Towing Corp.,*
No. 12 Civ. 1120(JG), 2013 WL 3010810 (E.D.N.Y. June 18, 2013) ......................................... 7

*GIITOU NEOR & TYRONE WALLACE on behalf of themselves, FLSA Collective Plaintiffs, &*
*the Class, Plaintiffs, v. ACACIA NETWORK, INC., d/b/a ACACIA NETWORK, ACACIA*
*NETWORK HOUSING INC., d/b/a ACACIA NETWORK, PROMESA RESIDENTIAL HEALTH*
*CARE FACILITY, INC., d* ........................................................................................................ 18

*Isett v. Aetna Life Ins. Co.,*
947 F.3d 122 (2d Cir. 2020) ..................................................................................... 13, 14, 15

*Levine v. Unity Health Sys.,*
847 F. Supp. 2d 507 (W.D.N.Y. 2012) ...................................................................... 13, 14, 17

*Marcus v. Lominy,*
No. 18 CIV. 1857 (NSR), 2022 WL 493688 (S.D.N.Y. Feb. 17, 2022) .................................. 6, 9

*Pippins v. KPMG LLP,*
921 F. Supp. 2d 26 (S.D.N.Y. 2012) ........................................................................... 15, 16

*Santillan v. Henao,*
822 F.Supp.2d 284 (E.D.N.Y.2011) ......................................................................................... 7

*Timberg v. Toombs,*
No. 20-CV-6060 (MKB), 2022 WL 954739 (E.D.N.Y. Mar. 30, 2022) ................................. 8, 9

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021) .......................................................................... 18

*Yeh v. Han Dynasty, Inc.,*
No. 18 CIV. 6018 (PAE), 2020 WL 883501 (S.D.N.Y. Feb. 24, 2020) ...................... 7, 9, 10, 12

Statutes

29 U.S.C. § 213(a)(1) ...................................................................................................................... 7
N.Y. Educ. Law §§ 7704 ............................................................................................................... 17
N.Y. Lab. Law § 650 ....................................................................................................................... 7
N.Y. Lab. Law § 651 ....................................................................................................................... 7

Rules

Federal Rule of Civil Procedure 56(c) ...................................................................................... 6, 20

Regulations

8 N.Y.C.R.R. § 52.30(a) ................................................................................................................ 16
29 C.F.R. § 541.300(a)(2)(i) ......................................................................................................... 14

29 C.F.R. § 541.700(a)..................................................................................................... 10
29 C.F.R. §§ 541.300, 541.301 ........................................................................................ 13
I  10

## PRELIMINARY STATEMENT

The undisputed record in this matter shows that Plaintiff's claims are without merit and the matter should be dismissed in its entirety with prejudice. In November 2016, the First Corinthian Baptist Church (the "Church") hired Plaintiff, Pastor Kyndra Frazier, to serve as an Associate Pastor. The Church's intent in bringing Plaintiff to this role was for her to launch a new Church-affiliated mental health program in Harlem, the HOPE Center. Plaintiff was hired because of her divinity training, social work license, along with her extensive education and experience in the field of counseling and social work.

In general, the minimum wage provisions of the New York Labor Law ("NYLL") did not apply to many aspects of Plaintiff's employment, as NYLL § 651(g) specifically exempts ministers, clergy, and similar positions from the definition of an "employee" covered by the statute. But additionally, as someone serving as the Executive Director of a mental health program, Plaintiff was also properly considered exempt under both the executive and professional exemptions of the NYLL. Accordingly, Plaintiff was paid an exempt salary of $60,000 per year ($1153.85 per week). She worked for almost four years, until her employment ended in June 2020, at the same salary with no complaint.

Ultimately, this matter begins and ends with these undisputed facts. Plaintiff's own deposition testimony shows that from the minute her employment began in 2016, to the minute it ended in 2020, she was an exempt employee, doing the same exempt work, being paid the same exempt salary at all times. Case closed.

Plaintiff has suffered no damages of any kind, and no questions of fact exist which might require trial. As such, no case or controversy exists that is ripe for adjudication, and there is no Article III standing for her claims.

Based on the foregoing, and on the arguments set forth in further detail below, Defendants seek an order dismissing this matter in its entirety with prejudice, along with all other and further relief this Court deems just and proper.

## STATEMENT OF FACTS

Plaintiff graduated from North Carolina Agricultural and Technical State University in 2004, with a Bachelor of Science in Business Management. *See, Transcript of Plaintiff Kyndra Frazier's Deposition* ("Frazier Transcript"), 20:11-22, attached to the *Declaration of John J. Byrnes* as **Motion Exhibit "1."** Plaintiff then attended the Candler School of Theology at Emory University and graduated in 2010 with a Master of Divinity. *Frazier Transcript*, 21:2-19. From 2012 to 2014, Plaintiff then attended Columbia University School of Social Work, and received a Master of Social Work in 2014. *Frazier Transcript*, 24:15-25, 25:1-6. Plaintiff passed the licensing exam to receive a Master of Social Work license from the state of Georgia in or around 2016, which she then used to obtain her Master of Social Work license in New York in March 2018. *Frazier Transcript*, 25:18-27:8.

Plaintiff first met Defendant, Senior Pastor Michael Walrond ("Pastor Walrond"), in 2012 while attending a worship service at the Church. *Frazier Transcript* 35:11-19. A few years later, in or around 2015, Plaintiff and Pastor Walrond began what would become an ongoing discussion about Plaintiff possibly taking an Associate Pastor position with the Church. *Frazier Transcript*, Pg. 37:24-25, 38:1-10. Plaintiff initially became interested in the position based on her discussion with Pastor Walrond regarding the work that would be involved. *Frazier Transcript*, 38:3-25. Specifically, Plaintiff believed that the Associate Pastor position would allow her to "merge" her clinical social work skill set, and the skill set derived from her Master of Divinity degree. *Id.* Moreover, what led Plaintiff to ultimately accept the position was that in the summer of 2016,

Pastor Walrond showed Plaintiff, in person, where her office would be and explained he would give her autonomy to carry out his vision of creating a mental health center at the Church, to serve both the Church and the Harlem community at large. *Frazier Transcript*, 39:17-25, 40:1-21. This exchange is extremely significant, because it demonstrates that from the very beginning, Plaintiff's role of Executive Director of the HOPE Center was **always** part of her Associate Pastor position. These were **not** separate roles.

The Church provided Plaintiff with an offer letter for the Associate Pastor position, which included a line item for Plaintiff's $60,000 per year ($1153.85 per week) exempt salary. *Frazier Transcript*, 46:1-19. *See also*, "Pastor Kyndra Frazier's Associate Pastor Job Offer Letter," entered into the record and verified by Plaintiff during her deposition, attached to the *Frazier Transcript* as **Defendant's Exhibit "C"**. Plaintiff then began working for the Church on or about November 1, 2016, under the title of Associate Pastor of Pastoral Care and Counseling. *Id. Frazier Transcript*, 40:22-24. Plaintiff confirmed that she continued to receive the $60,000 per year salary until her employment ended in June 2020. *Frazier Transcript*, 48:1-9.

Plaintiff testified that because she had been hired for the intended purpose of creating the HOPE Center, her initial responsibilities included everything that was required to get it fully up and running as a clinical mental health organization, right down to coming up with its name and serving as its Executive Director. *Frazier Transcript*, 52:1 – 55:20. Plaintiff testified that she used the same office for both her Associate Pastor responsibilities and her Executive Director responsibilities, and her only office was "at the HOPE Center" itself, not within the Church. *Frazier Transcript*, 50:16 – 51:8, 71:12-21. A ribbon cutting ceremony for the HOPE Center took place in December 2016. *Frazier Transcript*, 54:19-23.

Plaintiff testified that in her capacity as Executive Director of the HOPE Center, she provided therapy to individuals and groups of people both from the Church and from the Harlem community at large. *Frazier Transcript*, 73:8-13. Plaintiff also supervised and directed the work of the other employees at the HOPE Center, including another therapist, an Executive Administrator, a Director of Programing, and up to eight (8) clinical interns. *Frazier Transcript*, 56:6-12, 96:9 – 98:7.

Plaintiff also made staffing decisions for the HOPE Center, testifying that it was her idea to hire both the HOPE Center's Executive Administrator and Director of Programing. *Frazier Transcript*, 86:24 – 87:8. She personally presented the employment contracts to the people being hired for each position. *Id. See also*, "Director of Programing Welcome Package (Dr. Cecily Johnson)," entered into the record and verified by Plaintiff during her deposition, attached to the *Frazier Transcript* as **Defendant's Exhibit "F"**. *See*, "Executive Administrator Welcome Package (Robin Brown)," entered into the record and verified by Plaintiff during her deposition, attached to the *Frazier Transcript* as **Defendant's Exhibit "G"**.

Plaintiff testified that her role as Executive Director of the HOPE Center specifically required her to use her social work license, along with her extensive education and experience in the field of counseling and social work. *Frazier Transcript*, 102:12-21.

In or around 2019, the Church decided that it would be beneficial to transfer the HOPE Center (on paper, not physically) to the Church's 501(c)(3) non-profit, Defendant, FCBC Community Development Corporation (the "CDC"), as this would potentially allow the HOPE Center to have access to a broader spectrum of grant funding programs. See, *Transcript of Defendant Pastor Michael Walrond's Deposition* ("*Walrond Transcript*"), 29:5-15, attached to the *Declaration of John J. Byrnes* as **Motion Exhibit "2."** This transfer process was ultimately

completed somewhere during the time period of November 2019 to January 2020. *Walrond Transcript*, 27:19-21, 29:16-19. *See also*, *Transcript of Adel Attalla's Deposition* ("*Attalla Transcript*"), 27:9-14, attached to the *Declaration of John J. Byrnes* as **Motion Exhibit "3."**

Regardless of the transfer, Plaintiff testified that she never received any money directly from the CDC, and the CDC never provided her with a job offer letter, human resources paperwork, or tax documents such as a W-2 or 1099. *Frazier Transcript*, 67:12 – 68:7. Plaintiff testified that she was unsure of **when** the HOPE Center was transferred to the CDC, whether the transfer happened while she was still employed, or if the transfer ever actually happened **at all**. *Frazier Transcript*, 98:12-22. Based on this, it is unclear how Plaintiff has purported to have a good faith basis for her claims this whole time, since she blatantly admits that they are speculative in nature.

What is clear, however, is that the transfer of the HOPE Center to the CDC did not result in any functional changes to Plaintiff's job responsibilities, because even on the date of her deposition, Plaintiff remained unaware of whether the change ever actually happened. *Id.* Indeed, nothing changed about the HOPE Center other than its tax status. The HOPE Center's employees themselves remained on the Church's payroll, but with their pay now classified as a Church donation to CDC. *Attalla Transcript*, 20:20-25, 33:3-19.

Lastly, Plaintiff testified that she was **never** promised any additional pay for her role as Executive Director of the HOPE Center, whether by Pastor Walrond or any other person. *Frazier Transcript*, 92:12 – 93:13. Rather, Pastor Walrond indicated that Plaintiff was allowed to fundraise for additional salary through the grant application process, but Plaintiff herself admitted that such additional salary was entirely dependent on the success of such fundraising, and any additional pay would have only come from grant funds (although none of the grants were successful). *Id.* Plaintiff testified that there were only three grant applications in which she included a line item for

additional salary for herself. She testified that the first was never submitted for approval, and the second and third would not have been granted, assuming they were granted at all, until after she was no longer employed by the organization. *Frazier Transcript*, 93:13 – 95:12.

## SUMMARY JUDGMENT STANDARD

"Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, while materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law. In order to prove that a genuine issue of material fact exists, a plaintiff may not rest upon the mere allegations or denials of the pleadings, but must by affidavit or otherwise set forth specific facts showing that there is a genuine issue for trial. Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Marcus v. Lominy*, No. 18 CIV. 1857 (NSR), 2022 WL 493688, at *6 (S.D.N.Y. Feb. 17, 2022) (internal quotations and citations omitted).

"Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. If the initial burden is met, the non-moving party must produce specific facts indicating that a genuine issue of fact exists. If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.*

**LEGAL ARGUMENT**

**POINT I**

**PLAINTIFF WAS AN EXEMPT EXECUTIVE UNDER THE NYLL**

Plaintiff currently brings her claims under the NYLL through diversity jurisdiction. The Minimum Wage Act of the State of New York, Article 19 of the New York Labor Law, was enacted to provide employees in certain lower paying occupations with a wage sufficient "to provide adequate maintenance for themselves and their families." N.Y. Lab. Law § 650. Plaintiff's burden in establishing that she is an "employee" entitled to NYLL protections is similar to that of the Fair Labor Standards Act of 1938 ("FLSA'), as "[t]he New York Labor Law is the state analogue to the federal FLSA […]" *D'Arpa v. Runway Towing Corp.,* No. 12 Civ. 1120(JG), 2013 WL 3010810, at *18 (E.D.N.Y. June 18, 2013) (*quoting Santillan v. Henao,* 822 F.Supp.2d 284, 292 (E.D.N.Y.2011)).

Employees are exempt from the overtime provisions of the FLSA if they are employed in a *bona fide* executive capacity, and the NYLL provides for the same exemption. 29 U.S.C. § 213(a)(1); N.Y. Lab. Law § 651.

As a result, despite having different specific salary threshold requirements, the bulk of the analysis in this District views the FLSA and NYLL executive exemptions as fully analogous to one another, and able to be analyzed under the same standards. *Marcus v. Lominy, supra* at *13 ("[…] because the NYLL is the state analogue to the federal FLSA and it mirrors the FLSA in compensation provisions regarding minimum hourly wages and overtime, the Court's ensuing analysis on the third prong will solely focus on federal law but applies equally to [Plaintiff's] claims under the FLSA and the NYLL); *see also Yeh v. Han Dynasty, Inc.,* No. 18 CIV. 6018 (PAE), 2020 WL 883501, at *5 (S.D.N.Y. Feb. 24, 2020) ("Employees are exempt from the FLSA

overtime provision, however, if, inter alia, they are employed in a bona fide executive capacity. The labor laws of New York and Pennsylvania adopt the same exemption [internal quotations and citations omitted].").

"An employer seeking to rely upon such an exemption as a defense to paying overtime bears the burden of proving that such exemption applies. Until recently, it had been held, too, that because the FLSA is a remedial statute, its exemptions were to be construed narrowly against the employer [...] The Second Circuit, however, has repudiated that doctrine, holding that the FLSA's exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement, and courts therefore have no license to give the exemption anything but a fair reading." *Yeh v. Han Dynasty, Inc., supra* at *6 (internal quotations and citations omitted); *see also Timberg v. Toombs*, No. 20-CV-6060 (MKB), 2022 WL 954739, at *4 (E.D.N.Y. Mar. 30, 2022) ("While the Second Circuit previously instructed courts to narrowly construe FLSA exemptions because the FLSA is a remedial act, the Supreme Court and the Second Circuit have more recently instructed courts to give these exemptions a fair reading as they are as much a part of the FLSA's purpose as the overtime-pay requirement [...] [internal quotations and citations omitted]").

**a. Elements of the Executive Exemption.**

"Whether an exemption applies to a particular employee is a mixed question of law and fact. The question of how the employees spent their working time is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA [or NYLL] is question of law." *Yeh v. Han Dynasty, Inc., supra* at *6.

A person employed in a *bona fide* executive capacity is defined as an employee:

(1) Compensated on a salary basis at a rate of not less than:

     a.  New York City - Large employers of eleven or more employees $825.00 per week ($975.00 per week on and after December 31, 2017; $1,125.00 per week on and after December 31, 2018);

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*Id.* Courts analyze these requirements under a "salary basis" component and a "duties" component. *Id. See also Marcus v. Lominy, supra* at *16.

**b.  Salary Basis Test**

The salary basis component is a bright line test of whether or not the employee's compensation met or exceeded the required threshold. All it requires is a simple review of the employee's compensation. *See Yeh v. Han Dynasty, Inc., supra* at *6; *see also Marcus v. Lominy, supra* at *17. In the current matter it is undisputed that Plaintiff's salary for the duration of her employment from 2016 to 2020 was $60,000 per year, which breaks down to $1,153.85 per week. *Frazier Transcript*, 46:1-19. *See also*, **Defendant's Exhibit "C"** as attached to the *Frazier Transcript*. This is clearly above even the most recent New York City threshold for large employers of $1,125 per week. As such, Plaintiff satisfies this part of the test.

**c.  Duties Test**

The duties test requires a more in-depth review of the remaining executive exemption factors.

1. **Plaintiff's primary duty was management of the HOPE Center.**

An employee's "primary duty" is the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). It must be assessed based on all of the facts "with the major emphasis on the character of the employee's job as a whole." *Id.* Relevant factors include but are not limited to:

- The relative importance of the exempt duties as compared with other types of duties;

- The amount of time spent performing exempt work;

- The employee's relative freedom from direct supervision; and

- The relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*See Yeh v. Han Dynasty, Inc., supra* at *7. Similarly, activities that constitute "management" are considered to include:

> "interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures."

*Id.* In *Yeh v. Han Dynasty, Inc.*, a case concerning the head chef at a restaurant suing his employer for unpaid overtime, the Court held that,

> "[W]hatever the semantic differences are among the parties as to Yeh's title, it is unavoidably clear that Yeh's primary duties within the [defendant's] kitchen were managerial. To be sure, as Yeh notes, he [was] also functioned as a working chef at

HDP, [...] which is undisputed. And, on defendants' motion for summary judgment, the Court must credit Yeh's testimony on the disputed points as to whether he held an official title within the kitchen or whether he was formally delineated as having overall supervisory authority within the kitchen. But the range of specific duties that Yeh held make clear that—functionally—Yeh personally managed [defendant's] kitchen operations and that such was his primary responsibility. In particular, [...] Yeh in multiple ways supervised and monitored the performance of the other workers, [...] And Yeh oversaw the operation of the kitchen's daily and weekly operations, including taking responsibility for overall food quality and for the kitchen's interactions with outside vendors [...] That Yeh came to HDP with extensive experience as the kitchen manager (and owner) of Chinese restaurants, [...] also logically accords with his playing a predominantly managerial role in the kitchen."

*Yeh v. Han Dynasty, Inc., supra* at *10.

Like *Yeh*, Plaintiff in the current matter can very easily be considered the manager of the HOPE Center based on her own testimony. If anything, it is clear that no one is more adamant than Plaintiff herself that, from the very beginning of her employment in 2016, she acted as Executive Director of the HOPE Center and was directly tasked with creating and organizing it from the ground up. *Frazier Transcript*, 31:17-20, 52:5-25. *See Marcus v. Lominy, supra* at *17–18 ("Indeed, throughout the record, Marcus has described himself as both a 'founder' and 'Administrator' of [the Defendant's company]. Therefore, the Court grants summary judgment against Marcus's claims under the FLSA and NYLL for minimum wage and overtime.") Plaintiff similarly describes herself as managing and directing the daily activities of the HOPE Center from there on out, with tasks that included organizing and conducting therapy sessions, supervising interns and other therapists, making hiring decisions, and writing grant applications.

As a result, it is clear that by her own testimony, Plaintiff meets this prong of the executive exemption test.

### 2. Plaintiff customarily and regularly directed the work of two or more other employees.

Plaintiff has testified that she regularly supervised and directed the work of the HOPE Centers other therapist, its Executive Administrator, its Director of Programing, and up to eight (8) clinical interns. *Frazier Transcript*, 56:6-12, 96:9 – 98:7. *See Yeh v. Han Dynasty, Inc., supra* at *11 (Yeh's testimony itself established that the [defendant's] kitchen staff included, at all times, two or more workers other than himself)

### 3. Plaintiff had the authority to hire or fire other employees and/or her suggestions for same carried particular weight.

Factors to consider for this element include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Significantly, an employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher-level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status. *Id.*

In the current matter, this element is clearly met, since Plaintiff testified herself that is was her idea to hire both the HOPE Center's Executive Administrator and Director of Programing. *Frazier Transcript*, 86:24 – 87:8.

Based on the foregoing, it is clear that Plaintiff was an exempt executive employee. As such, her exempt $60,000 per year salary covered the full scope of her employment, including all of the tasks she performed and the time it took her to perform them.

Plaintiff's efforts to claim that this salary only covered her Associate Pastor role, and not her HOPE Center role, are flatly contradicted by her own testimony. Specifically, she has testified

that she was hired by the Church in November 2016, years before the CDC was ever involved, to serve as Associate Pastor and, in that capacity, **specifically** to create the HOPE Center and ultimately serve as its Executive Director. This arrangement remained unchanged until her employment ended in June 2020.

## POINT II

### PLAINTIFF WAS AN EXEMPT LEARNED PROFESSIONAL UNDER THE NYLL

Under both the FLSA and NYLL, determining whether an individual is an exempt, *bona fide* professional involves a two-part test. It requires that: (1) the employee must be paid on a salary basis, at least $684 per week (note, with respect to the professional exemption, the NYLL has no specified salary threshold and therefore defaults to the FLSA guidelines); and (2) to be considered a learned professional, the employee's primary duty must be, "[T]he performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction [...]" 29 C.F.R. §§ 541.300, 541.301 (defining the "learned professional" exemption). *Levine v. Unity Health Sys.*, 847 F. Supp. 2d 507, 509 (W.D.N.Y. 2012).

This second part of the analysis ultimately breaks down into three parts: "Accordingly, to qualify for the exemption, the employee must satisfy a primary duty test consisting of three factors or prongs: (1) the work requires advanced knowledge, (2) in a field of science or learning, (3) customarily acquired by a prolonged course of specialized intellectual instruction. *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 128 (2d Cir. 2020) (internal quotations and citations omitted). "All three prongs of the primary duty test must be satisfied for the learned professional exemption to apply. Moreover, the employer bears the burden of proving that the employee qualifies for the exemption." *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 128 (2d Cir. 2020).

### a. Salary Basis Test

Pursuant to the same analysis above concerning the executive exemption, it follows that Plaintiff necessarily meets the lower salary basis threshold for the learned professional exemption.

### b. Primary Duty Test

The "advanced knowledge" requirement for learned professionals requires that the employee's "primary" duty be "the performance of work ... requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." *Levine v. Unity Health Sys.* at 510; *citing* 29 C.F.R. § 541.300(a)(2)(i).

In *Levine v. Unity Health Sys*, the Court held specifically with respect to therapists that the

"absence of authority to diagnose or unilaterally prescribe a treatment plan is not determinative of whether an employee is a learned professional, and the duties of PTs undisputedly were not limited solely to assessment and proposal, but included direct patient contact and leadership of group therapy sessions. The proper focus of the analysis is not upon the authority given to the employee, but whether the employee's primary duties, whatever they may be, require knowledge of an advanced type in a field customarily acquired by a prolonged course of specialized intellectual instruction. On this basis, the learned professional exemption has been applied by courts to a number of medical and social-services jobs not involving diagnosis and sole control over treatment, such as school athletic trainers who help to rehabilitate injuries, nurses, and a truancy prevention case manager who assesses children and families and recommends treatment and other resources."

*Levine v. Unity Health Sys.*, *supra* at 10, *citing* 29 C.F.R. § 541.300(a)(2)(i) (internal quotations and citations omitted). As noted within *Levine* itself, this duties analysis has been similarly performed by many other Courts with respect to a wide range of professions.

For example, in *Isett v. Aetna Life Ins. Co.*, the Second Circuit Court of Appeals affirmed that Registered Nurse's qualified for the exemption even if they were only working in the capacity of reviewing medical records for an insurance carrier, holding that the review process itself required use of their education, training, licensing, and expertise that qualified them as learned

professionals. *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 127 (2d Cir. 2020) ("We affirm the District Court's judgment that Isett was classified properly as exempt under the professional exemption.")

Additionally, as recently as this year, the Eastern District in *Boutsikakis v. Tri-Borough Home Care, Ltd.*, held that "[…] courts considering NYLL overtime claims have applied federal law to conclude that registered nurses ... meet the test for professional employment and so are exempt from New York's overtime provisions." *Boutsikakis v. Tri-Borough Home Care, Ltd.*, No. 15 CV 5833 (DG)(RML), 2023 WL 3620646, at *13 (E.D.N.Y. Apr. 11, 2023). Interestingly, the Court held that even where Defendants' arguments were focused solely on the FLSA as an allegory for the NYLL, the absence of NYLL-specific arguments did not prevent dismissal of the NYLL claims. The Court held, "[…] plaintiffs do not dispute that they were employed by defendant as registered nurses […] Therefore, there is no genuine dispute of material fact related to whether plaintiffs meet the test for professional employment and are exempt from New York's overtime provisions. I recommend that defendant's motion for summary judgment be granted on plaintiffs' NYLL claim." *Id.* at *14 (from Report and Recommendation of Magistrate Judge Rober M. Levy, adopted on August 22, 2023).

Finally, it is worth noting that these recent decisions rely on years of long-standing legal precedent, and there is little about the professional exemption under either the FLSA or NYLL that is currently new or novel in any way. Going back almost a decade, this Court held in *Pippins v. KPMG LLP*, that, "To qualify as a learned professional, an employee's primary duty must be the performance of (1) work requiring advanced knowledge (2) in a field of science or learning (3) that is customarily acquired by a prolonged course of specialized intellectual instruction." *Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 43 (S.D.N.Y. 2012), aff'd, 759 F.3d 235 (2d Cir. 2014) (internal quotations and citations omitted). The Court in Pippins held further, "Employees who spend more

Page 15 of 20

than 50 percent of their time performing exempt work will generally satisfy the primary duty

requirement" and that by nature, "[…] accounting qualifies as a field of science and learning, the

second prong of the primary duty test." *Id.* Perhaps most importantly, the Court in Pippins

elaborated on the third prong of the duties test:

> "The phrase 'customarily acquired by a prolonged course of specialized intellectual
> instruction' restricts the exemption to professions where specialized academic
> training is a standard prerequisite for entrance into the profession. The best prima
> facie evidence that an employee meets this requirement is possession of the
> appropriate academic degree. However, the word 'customarily' means that the
> exemption is also available to employees in such professions who have
> substantially the same knowledge level and perform substantially the same work as
> the degreed employees, but who attained the advanced knowledge through a
> combination of work experience and intellectual instruction. Thus, for example, the
> learned professional exemption is available to the occasional lawyer who has not
> gone to law school, or the occasional chemist who is not the possessor of a degree
> in chemistry. However, the learned professional exemption is not available for
> occupations that customarily may be performed with only the general knowledge
> acquired by an academic degree in any field, with knowledge acquired through an
> apprenticeship, or with training in the performance of routine mental, manual,
> mechanical or physical processes."

*Pippins v. KPMG LLP*, at 44 (holding, "No reasonable trier of fact could possibly conclude that

Audit Associates do not meet the requirements of the regulation.") (Granting defendant's motion

for summary judgment).

The current matter, however, seems perfectly analogous to *Levine*. In fact, the Court in

Levine held specifically that:

> "The educational requirements for the PT position are also undisputed. PTs are
> required to obtain a master's degree in social work, mental health counseling,
> marriage and family therapy, and/or creative arts therapy. They also must secure
> and maintain state licensure (or a state-issued permit, followed within 1–2 years by
> licensure) as a Licenced Mental Health Counselor ("LMHC"), which itself requires
> a master's degree in one of the same four areas. Each of these areas is designated
> by New York State as forming a separate professional classification, and each
> requires highly particularized coursework tailored to the relevant area of licensure,
> the academic requirements for which are set forth in detail in the New York
> Education Law. See 8 N.Y.C.R.R. § 52.30(a) (social work master's degree requires
> 60 semester hours of study covering six designated areas of study and a field

practicum of a minimum 900 clock hours); N.Y. Educ. Law §§ 7704 (social work master's degree to be from a registered and accredited program, with a minimum twelve hours of clinical courses); 8402 (mental health counseling coursework to include ten specified areas of study, plus a minimum one-year supervised internship); 8403 (marriage and family counseling coursework to include six specified areas of study, plus a practicum with a minimum of 300 client contact hours); 8404 (creative arts therapy coursework to include seven areas of study, including clinical experience)."

*Levine v. Unity Health Sys.*, *supra* at 511.

It is clear that Plaintiff in the current matter falls squarely within the same evaluation of the learned professional exemption as the plaintiffs in *Levine*. In fact, Plaintiff specifically testified that her role as Executive Director of the HOPE Center required her to use her social work license, along with her extensive education underlying that license, and her experience in the field of counseling and social work. *Frazier Transcript*, 102:12-21. As such, Plaintiff's qualifications for the learned professional exemption are wholly undisputed.

The same as with the executive exemption, based on the foregoing it is clear that Plaintiff was also working the capacity of an exempt learned professional. Her $60,000 per year salary can once again be said to have covered the full scope of her employment, including all of the tasks she performed and the time it took her to perform them. As such, she is not entitled to further wages of any kind, and has not suffered any damages in this matter whatsoever.

## POINT III

### NO ARTICLE III STANDING EXISTS
### FOR PLAINTIFF'S WAGE STATEMENT AND WAGE NOTICE CLAIMS

"To satisfy Article III's standing requirements, Plaintiffs must do more than allege a bare statutory procedural violation, divorced from any concrete harm. Physical and monetary harms are generally concrete. For intangible injuries to be concrete, the injury must be real, and not abstract. In evaluating the injury, the Court considers whether the alleged injury has a close relationship to

a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts. For example, harm to one's reputation and privacy are intangible injuries that have been recognized as concrete. However, to establish Article III standing for an 'informational injury,' Plaintiffs must show that they had an interest in using the information beyond bringing their lawsuit." *GIITOU NEOR & TYRONE WALLACE on behalf of themselves, FLSA Collective Plaintiffs, & the Class, Plaintiffs, v. ACACIA NETWORK, INC., d/b/a ACACIA NETWORK, ACACIA NETWORK HOUSING INC., d/b/a ACACIA NETWORK, PROMESA RESIDENTIAL HEALTH CARE FACILITY, INC., d/b/a PROMESA, & JOHN DOE CORP 1-100, Defendants.*, No. 22-CV-04814 (ER), 2023 WL 6930000, at *5 (S.D.N.Y. Oct. 19, 2023) (internal quotations and citations omitted), cit*ing TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205, 210 L. Ed. 2d 568 (2021) ("Importantly, this Court has rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right [...] Article III standing requires a concrete injury even in the context of a statutory violation.")

"Since *TransUnion*, several courts in this circuit have found a defendant's failure to provide proper wage statements to its employees to be a technical statutory violation that cannot sustain Article III standing in federal court." *Id.* "Perhaps most analogous to the instant dispute, the Court dismissed a plaintiff's wage statement claim for lack of standing when the injury plaintiff alleged was an inability to bring his lawsuit sooner." *Id.*

In the current matter, it is clear that for the duration of her employment, Plaintiff was an exempt employee, performing exclusively exempt tasks, being paid an exempt salary. Plaintiff's own testimony confirmed that the Church provided Plaintiff with an offer letter prior to the start of her Associate Pastor position, which included a line item for Plaintiff's $60,000 per year exempt

Page 18 of 20

salary. *Frazier Transcript*, 46:1-19. Plaintiff has also expressly testified that her reason for taking the Associate Pastor position in the first place was because it would give her autonomy to carry out Pastor Walrond's vision of creating a mental health center at the Church that would serve both the Church community and the Harlem community at large. *Frazier Transcript*, 39:17-25, 40:1-21. Plaintiff's current attempts to allege that her one job was actually two jobs are directly defeated by her own statements.

But even beyond this, it is unclear how the CDC, which did not become involved until three years **after** Plaintiff was hired, could have possibly failed to provide Plaintiff with a wage notice at the time she was hired. This is simply an impossibility.

When the CDC did finally become involved, Plaintiff's testimony indicates that absolutely nothing changed with respect to her salary. As such, it is equally unclear what tangible harm could have possibly resulted from the CDC's alleged failure to provide Plaintiff with a wage notice or wage statements even at that time, when they simply would have reiterated what she already knew; her salary was $60,000 per year and she was an exempt employee. Indeed, there is no tangible harm to speak of, and as such there is no Article III standing for these claims.

Based on the foregoing, Plaintiff's wage notice and wage statement claims and should be dismissed in their entirety with prejudice.

## CONCLUSION

The undisputed record in this matter clearly demonstrates that Plaintiff performed the same job for almost four years and was properly paid for it. At all times, she was an exempt employee, doing exempt work, being paid an exempt salary. Plaintiff's own deposition testimony very clearly illustrates the fatal inconsistencies of her allegations. The basis for the dismissal of

her claims, in their entirety, with prejudice is formed in her own words. She has suffered no damages or tangible harm to speak of, and no standing exists for her claims under Article III.

WHEREFORE, Defendants respectfully request that this Court issue an order in accordance with Federal Rule of Civil Procedure 56(c), dismissing Plaintiff's claims in their entirety with prejudice, and granting all further relief the Court deems just and proper.

Dated: Woodbury, New York
      November 3, 2023

Respectfully Submitted,

MILBER MAKRIS PLOUSADIS
& SEIDEN, LLP

John J. Byrnes, Esq.
Attorney for Defendants
1000 Woodbury Road, Suite 402
Woodbury, New York 11797
(516) 712-4000
Our File No.: 420-23791
jbyrnes@milbermakris.com

**VIA ECF**
TO:   Alexandra Berke, Esq.
BERKE-WEISS LAW PLLC
Attorney for Plaintiff
150 East 52nd Street, Suite 21002
New York, New York 10022
(212) 888-2680
alex@berkeweisslaw.com